UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

 Jay WINEGARD, on behalf of himself
 and all others similarly situated,

                                     **MEMORANDUM & ORDER**

                Plaintiff,           19-CV-04420(EK)(RER)

             -against-

 NEWSDAY LLC d/b/a NEWSDAY,

                Defendant.

------------------------------------x

ERIC KOMITEE, United States District Judge:

        Title III of the Americans with Disabilities Act
("ADA") prohibits discrimination against the disabled "in the
full and equal enjoyment of the goods, services, facilities,
privileges, advantages, or accommodations of any place of public
accommodation."  42 U.S.C. § 12182(a).  This case presents the
question of whether a website constitutes a "place of public
accommodation" under the ADA.

        The Second Circuit has not squarely resolved that
question.  As discussed below, district courts in this Circuit
have generally concluded that a website does qualify as such —
at least when the site in question serves as an adjunct to a
brick-and-mortar business.  The majority of circuit courts,
however, have held that websites are not places of public
accommodation.  The Supreme Court recently declined to take up

the question.  *See Robles v. Domino's Pizza, LLC*, 913 F.3d 898

(9th Cir. 2019), *cert. denied*, 140 S. Ct. 122 (2019).

Given that the Second Circuit has not spoken

definitively, I consider the statute's text and its context, as

well as the history of the term "place of public accommodation."

I also consider the closest Second Circuit authority — the case

of *Pallozzi v. Allstate Life Insurance Co.*, 198 F.3d 28 (2d Cir.

1999).  Reading these sources, I am constrained to conclude that

the ADA excludes, by its plain language, the websites of

businesses with no public-facing, physical retail operations

from the definition of "public accommodations."  I therefore

grant Defendant's motion to dismiss.

## I.   Background

The following facts are taken from the complaint and

assumed to be true for purposes of this motion.  Jay Winegard is

a deaf individual residing in Queens, New York.  He brings this

action on behalf of himself and others against Newsday, a local

newspaper company.  Newsday distributes its newspaper throughout

New York, but it operates no physical retail operations.  Its

print newspaper is also available on Newsday's website,

www.newsday.com, along with other web-based content.  Winegard

alleges that he visited Newsday's website to watch various

videos, including programs entitled "Dumpling Craze Hits Long

Island: Feed Me TV" and "High and Mighty: Feed Me TV," but was unable to view them because the videos lacked closed captioning.

Plaintiff alleges that Newsday is violating the ADA by denying deaf and hard-of-hearing individuals equal participation in watching videos on its website, 42 U.S.C. § 12182(b)(1)(A), and failing to make reasonable modifications to the videos to afford access, *id.* § 12182(b)(2)(A)(ii). These claims are combined in Winegard's First Cause of Action, and all stand or fall on whether Newsday's website is a "place of public accommodation." *Id.* § 12182(a). Winegard also brings claims under the New York State and New York City human rights laws.

Defendant now moves to dismiss the complaint for lack of standing and failure to state a claim.

## II. Discussion

### A. Standing

Newsday first contends that Plaintiff lacks standing because the videos in question are available on YouTube, in addition to Newsday's website, and YouTube offers closed captioning. Because he could have viewed the videos elsewhere, Defendant argues, Plaintiff has suffered no "concrete" harm, and therefore cannot allege an injury-in-fact sufficient to satisfy the Article III standing requirements set out in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016).

3

This argument strikes the Court as analogous to arguing, in the case of an alleged physical barrier, that a disabled person suffers no injury sufficient to confer standing so long as an accessible store down the block offers the same product.  Plaintiff cites no authority for the proposition that a *competitor's* accessibility deprives an otherwise aggrieved plaintiff of standing, and this Court is aware of none.  *Cf. Mahon v. Ticor Title Ins. Co.*, 683 F.3d 59, 62 (2d Cir. 2012) ("Demonstrating that the *defendant's* allegedly unlawful conduct caused injury to the plaintiff . . . is thus generally an essential component of Article III standing." (emphasis added)). Defendant's motion to dismiss for lack of jurisdiction is therefore denied, and I proceed to consider Defendant's motion to dismiss for failure to state a valid ADA claim.

## B.  Americans with Disabilities Act

The ADA is a "broad mandate" with a "sweeping purpose" — it "forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III)."  *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001).  "As a remedial statute, the ADA must be broadly construed to effectuate its purpose of providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  *Noel v.*

*N.Y.C. Taxi & Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012) (internal quotation marks omitted).

As noted above, the ADA's prohibitions on discrimination do not apply to all businesses.  They apply to places of public accommodation: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any *place of public accommodation* by any person who owns, leases (or leases to), or operates a *place of public accommodation*."  42 U.S.C § 12182(a) (emphases added).

## C.  The Statute's Text and History

1.    "Public Accommodation"

The phrase "public accommodation" has a long history. At common law, it referred to the particular subset of businesses that had heightened duties of service — often relating to lodging and transportation — because of the public nature of their physical facilities.  *Vandewater v. Mills*, 60 U.S. 82, 87 (1856) (passenger steamships were "for the public accommodation"); *Fanning v. Gregoire*, 57 U.S. 524, 529 (1853) (ferries); *Proprietors of Charles River Bridge v. Proprietors of Warren Bridge*, 36 U.S. 420, 554 (1837) (bridge).

Antidiscrimination statutes like the ADA have used the term "place of public accommodation" for over a century.  A New

York statute passed in 1895, for example, required that all persons "be entitled to the full and equal accommodations, advantages, facilities and privileges of inns, restaurants, hotels, eating houses, bath houses, barber shops, theatres, music halls, public conveyances on land and water, and all other places of public accommodation or amusement." *Burks v. Bosso*, 180 N.Y. 341, 342-43 (1905).  The scope of businesses covered has grown over time to include other types of public entertainment and service facilities.  But it has not expanded to include every type of business operation.

The ADA's definition of "public accommodation" is consistent with this history.  Section 301 of Title III of the ADA, 42 U.S.C. § 12181(7), contains that definition.  In considering whether it extends to intangible spaces, it is worth setting out the definition in its entirety.  It reads:

> (7) **Public accommodation.**  The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce—
>
> (A)  an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;
>
> (B)  a restaurant, bar, or other establishment serving food or drink;

6

    (C)  a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

    (D)  an auditorium, convention center, lecture hall, or other place of public gathering;

    (E)  a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

    (F)  a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

    (G)  a terminal, depot, or other station used for specified public transportation;

    (H)  a museum, library, gallery, or other place of public display or collection;

    (I)  a park, zoo, amusement park, or other place of recreation;

    (J)  a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

    (K)  a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

    (L)  a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

The limitation emerging from this definition is unmistakable.  The definition contains twelve subparagraphs, each followed by a general residual clause.  Those subparagraphs contain a total — by my count — of fifty specific examples.  Of

those fifty examples, at least forty-nine indisputably relate to physical places.[1]

This limitation was obviously deliberate.  Congress could easily have said "all businesses operating in interstate commerce," or referred to all "retail" or "service" operations. But it chose instead to focus on physical places.  At a more specific level, if Congress had wanted to capture business operations rather than places, it would have said "accounting firm or law firm," rather than using the clunkier phrase "office of an accountant or lawyer," for example; and it would have said "health care practice" rather than "office of a health care provider."  Apropos of this case, Congress could easily have included "newspapers."  It did not.  These choices demonstrate Congress's decision to apply the ADA's anti-discrimination provision to physical places rather than business operations generally.

Some courts have written that the ADA's framers could not have anticipated the world wide web when they crafted the

---

[1] Some courts have noted that "travel service" does not invariably refer to a physical space, though there is no suggestion in the statute (or in logic) that a travel service *must* be a virtual operation.  Read in context, "travel service" appears to refer to travel agencies and to facilities — such as American Express counters — offering traveler's cheques, currency-exchange services and the like.  These businesses commonly operated out of physical facilities when the ADA was adopted, and still do (albeit in lesser numbers). *See, e.g.*, *Liberty Travel: Our Story*, Liberty Travel (Liberty opened its first travel agent storefront in 1951, and continues to offer locations throughout the United States), https://www.libertytravel.com/about (last visited August 16, 2021).

"public accommodation" definition in 1990.[2]  This is not really

true.[3]  But even if it were, there were countless other types of

businesses operating outside of brick-and-mortar premises in

1990, including some that had been in operation for decades.

The Sears Roebuck catalog, for example, dated to 1888.  *See*

*History of the Sears Catalog,* Sears Archives, ("In 1888, Richard

Sears first used a printed mailer to advertise watches and

jewelry . . . .  The time was right for mail order

merchandise.");[4] *see also An Inside Look at an Outdoor Icon*, L.L.

---

[2] *See, e.g.*, *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196, 200 (D. Mass. 2012) (observing that "web-based services did not exist when the ADA was passed in 1990 and, thus, could not have been explicitly included in the Act"); *Nat'l Fed'n of the Blind v. Scribd Inc.*, 97 F. Supp. 3d 565, 575 (D. Vt. 2015) ("When [the ADA] was enacted Congress had no conception of how the Internet would change global commerce.").

[3] By 1990, the internet had been in development for decades, with the U.S. government leading the effort.  And Congress knew well by 1990 that the internet was coming.  The Senate held hearings in 1989 "to explore the potential of a national information superhighway."  Jeffery Kahn, *Building and Rescuing the Information Superhighway*, Berkeley Lab ScienceBeat, https://www2.lbl.gov/Science-Articles/Archive/information-superhighway.html (last visited August 16, 2021); *see also* H.R. Sub. Comm. on Science Space and Technology, 100th Congress, Rep. on High Performance Computing (1989).  The internet was then, of course, "still in its earliest incarnation."  John Markoff, *Ideas & Trends:  Scientists Share Data at Speed of Light*, N.Y. Times (June 4, 1989), https://www.nytimes.com/1989/06/04/weekinreview/ideas-trends-scientists-share-data-at-speed-of-light.html; *see also id.* ("Senator Albert Gore Jr., a Tennessee Democrat, has introduced a bill . . . that would create a data 'superhighway' to link scientists . . . .  The plan is to speed the exchange of data by thousands of times.").  But retailers' embrace of the internet followed soon thereafter.  *See, e.g.*, Peter H. Lewis, *Attention Shoppers: Internet Is Open*, N.Y. Times, Aug. 12, 1994, https://www.nytimes.com/1994/08/12/business/attention-shoppers-internet-is-open.html.

[4] *See* http://www.searsarchives.com/catalogs/history.htm (last visited August 16, 2021).  "Reflecting modern trends in retailing, the [Sears] company decided to stop producing the general catalog in 1993" — after the adoption of the ADA.  *Id.* (noting that Sears continued offering "many [other] specialty catalogs" after that point).

Bean (L.L.'s circulars evolved into a catalog by 1927);[5] *How America Fell in and out of Love with J. Crew*, CNN (J. Crew "relaunched" as a catalog-only retailer in 1983);[6] *'8 CDs for a Penny' Company Files for Bankruptcy*, NPR (Columbia House started selling vinyl records via mail order in 1955);[7] *Don't Judge the Book-of-the-Month Club by Its Cover*, Smithsonian Magazine (Book-of-the-Month-Club began its subscription service in 1926);[8] QVC.com (television shopping channel's first broadcast was in 1986);[9] *History of As Seen on TV*, As Seen on TV (first "As-Seen-on-TV" infomercial aired in the mid-1950s).[10]  If Congress had intended, it could easily have required catalogs to be printed in Braille and TV shows to include closed captioning by including such media within the scope of "public accommodations."[11]

---

[5] https://www.llbean.com/llb/shop/516918?nav=ln-516917 (last visited August 16, 2021).

[6] https://www.cnn.com/style/article/j-crew-bankruptcy-fashion-history/index.html (last visited August 16, 2021).

[7] https://www.npr.org/sections/thetwo-way/2015/08/11/431547925/8-cds-for-a-penny-company-files-for-bankruptcy (last visited August 16, 2021).

[8] https://www.smithsonianmag.com/smart-news/dont-judge-book-month-club-its-cover-180962382/ (last visited August 16, 2021).

[9] https://corporate.qvc.com/ (last visited August 16, 2021).

[10] https://www.asseenontvwebstore.com/category-s/127.htm (last visited August 16, 2021).

[11] The ADA was amended in 2008.  *See* ADA Amendments Act of 2008, Pub. L. 110-325, 112 Stat. 3553 (2008).  If websites had indeed been overlooked in the 1990 bill simply because the internet was in its infancy, Congress could

Plaintiff argues that Newsday's website falls within four specific residual clauses in Section 12181: that it is a "place[] of exhibition or entertainment"; a "place[] of recreation"; a "sales or rental establishment"; and a "service establishment[]." *See* Compl. ¶ 11 (referring to 42 U.S.C. § 12181(7)(C), (I), (E), and (F)); *see also* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss the Complaint ("Pl.'s Opp.") at 1, ECF No. 16 (citing 42 U.S.C. § 12181(7)(E)).  But these general clauses must be read in light of the specific lists they follow.  The maxim *ejusdem generis* teaches that a residual clause's meaning should be confined to the characteristics of the specific items listed before it. *E.g.*, *Hall St. Assocs. v. Mattel*, 552 U.S. 576, 586 (2008) ("[W]hen a statute sets out a series of specific items ending with a general term, that general term is confined to covering subjects comparable to the specifics it follows."); *see also Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) ("[W]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the

---

have amended the definition to clarify their inclusion with the later amendment.  The fact that it did not — even after cases like *Weyer*, 198 F.3d at 1114 and *Ford*, 145 F.3d at 614 were decided — cuts against the Plaintiff's position. *Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330, 338 (1988) ("We have recognized that Congress' failure to disturb a consistent judicial interpretation of a statute may provide some indication that Congress at least acquiesces in, and apparently affirms, that interpretation.").

preceding specific words." (quoting 2A N. Singer, Sutherland on Statutes and Statutory Construction § 47.17 (1991)).

Other circuits have applied this maxim (or the related doctrine of *noscitur a sociis*) to hold that Section 12181(7) is limited to physical places.[12]  *E.g., Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000) ("All the items on this list . . . have something in common.  They are actual, physical places . . . ."); *Ford v. Schering–Plough Corp.*, 145 F.3d 601, 614 (3d Cir. 1998) ("Pursuant to the doctrine of *noscitur a sociis* . . . we do not find the term 'public accommodation' or the terms in 42 U.S.C. § 12181(7) to refer to non-physical access or even to be ambiguous as to their meaning."); *see also Thorne v. Boston Mkt. Corp.*, 469 F. Supp. 3d 130, 140 (S.D.N.Y. 2020) ("The subject of the residual clause is 'establishment,' not the 'food or drink' that is being 'served.'  Therefore, based on the text of the statute alone, a gift card does not plausibly fall into the scope of the text's definition of a 'public accommodation.'" (cleaned up)).  All the

---

[12] The maxim of *noscitur a sociis* provides that individual items appearing in a list should be read to share common attributes.  *E.g., S.D. Warren Co. v. Maine Bd. of Env't Prot.*, 547 U.S. 370, 378 (2006); *see also Beecham v. United States*, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well.").  When an enumerated item in a statutory list has multiple definitions, the word should be read according to the definition most similar to the nearby words' meanings.  *See Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990).

specific examples preceding Section 12181's residual clauses refer to brick-and-mortar locations.  Applying the maxims of *ejusdem generis* and *noscitur a sociis*, the residual clauses must be read to reach only "public accommodation[s]" of the same type.

Other courts reading the ADA definition's text have come to the same conclusion.  For example, the Eleventh Circuit in *Gil v. Winn-Dixie Stores, Inc.* looked only to the "unambiguous and clear" plain language of Title III.  993 F.3d 1266, 1276–77 (11th Cir. 2021).  The twelve subparagraphs in Section 12181(7), it observed, list only "tangible, physical places" and no "intangible places or spaces."  *Id*.  A "public accommodation" is thus "limited to actual, physical places."  *Id*.

2.   "Place Of"

All this is clear enough even before we get to the statute's use of the phrase "place of" to modify the term "public accommodation."  Set together in sequence, the collective phrasing leaves no doubt that Section 12182(a) was not meant to reach the website of a business like Newsday.  Dictionaries overwhelmingly define "place" to mean a physical location.  Webster's Third, for example, begins with the following definitions: "1. open space in a city, space, locality"; "1.a. a way for admission or transit"; "1.b. physical

13

environment"; "1.c. physical surroundings."  Webster's Third New International Dictionary 1727 (2002).  Webster's Second, similarly, begins with: "An open space, or square, in a city or town."  Webster's Second New International Dictionary 1877 (1945).

Other courts looking to the definition of "place" have come to similar understandings.  In 2017, the Federal Circuit addressed the phrase "regular and established place of business" in 28 U.S.C. § 1400, which governs venue in patent infringement cases.  *In re Cray, Inc.*, 871 F.3d 1355 (Fed. Cir. 2017).  In holding that "regular and established place of business" requires a "physical place," the court wrote:

> The statute requires a "place," *i.e.*, "[a] building or a part of a building set apart for any purpose" or "quarters of any kind" from which business is conducted.  William Dwight Whitney, The Century Dictionary, 732 (Benjamin E. Smith, ed. 1911); *see also* Place, Black's Law Dictionary (1st ed. 1891) (defining place as a "locality, limited by boundaries").  *The statute thus cannot be read to refer merely to a virtual space or to electronic communications from one person to another.*

*Id.* at 1362 (emphasis added); *see also, e.g.*, *Magee v. Coca-Cola Refreshments USA, Inc.*, 833 F.3d 530, 534-35 (5th Cir. 2016) ("*Webster's Third New International Dictionary* defines . . . 'place' as 'a building or locality used for a special purpose.' . . . . *Black's Law Dictionary* defines 'place of business' as '[a] location at which one carries on a business.'").

14

The United States Supreme Court has not reached the precise ADA question presented here.  But it has read the word "place" to invoke a "physical location" in the exact phrase — "place of public accommodation" — at issue in this case.  *Boy Scouts of America v. Dale,* 530 U.S. 640 (2000), involved the constitutionality of a state law: the Court considered whether New Jersey had violated the First Amendment's right of expressive association in applying its public-accommodations law to a private membership group.  Writing for the majority, Chief Justice Rehnquist noted that "[s]tate public accommodations laws were originally enacted to prevent discrimination in traditional places of public accommodation — like inns and trains."  *Id.* at 656.  While acknowledging that state-law definitions had expanded over the years, the majority nevertheless appeared taken aback that New Jersey's Supreme Court had "applied its public accommodations law to a private entity without even attempting to tie the term 'place' to a physical location."  *Id.* at 657.  This observation, made *after* the adoption of the ADA in 1990, affirms that "places" of public accommodation are presumptively physical locations, at least in federal court.

The Supreme Court went on to consider the phrase "place of public accommodation" again a year later — this time in the context of the ADA itself.  In determining whether a ban on using golf carts discriminated against a golfer who could not

walk the entire course, the Supreme Court began with a focus on "place": "The [PGA Tour] events occur on 'golf course[s],' a *type of place* specifically identified by the Act as a public accommodation." *PGA Tour, Inc.*, 532 U.S. at 677 (2001) (emphasis added).

For these reasons, I conclude that the text of the ADA's definition of "public accommodation" clearly refers to physical places, and does not include stand-alone websites.

D. *Pallozzi*

Most district court cases reaching the opposite conclusion in this Circuit have done so in reliance on the Second Circuit's decision in *Pallozzi v. Allstate Life Insurance Co.*, 198 F.3d 28 (2d Cir. 1999).  But *Pallozzi* does not compel an outcome at odds with the plain-text reading above.

*Pallozzi* involved a lawsuit against an insurance company that refused to issue a policy based on the plaintiffs' mental-health diagnoses.  The holding did not turn on the definition of "place of public accommodation" in Section 12181(7).  There was no dispute that an "insurance office" qualifies as such, given that it is listed explicitly among the specific examples in Section 12181(7)(F).  198 F.3d at 32 ("We start with the fact that Title III specifies an 'insurance

16

office' as a 'public accommodation.'").[13]  Having accepted that

an insurance office is a "public accommodation," the Court of

Appeals turned to the application of Section 12182(a) ("No

individual shall be discriminated against on the basis of

disability in the full and equal enjoyment of the goods,

services, facilities, privileges, advantages, or accommodations

of any place of public accommodation . . . .").

     The Court of Appeals' analysis thus focused on whether

an insurance policy is a "good" or "service" *of* an insurance

office.  Unsurprisingly, the court concluded that the "full and

equal enjoyment" of an insurer's "goods and services" extends to

the consumption of insurance policies.  The panel held that

"Title III does regulate the sale of insurance policies *in*

*insurance offices." Id.* at 33 (emphasis added).  The physical

place, per *Pallozzi*, is a condition precedent; once that

condition is satisfied, the goods and services sold by that

place of public accommodation are swept within the ADA's remit.

     But those goods and services are not covered by the

ADA unless and until the "place of public accommodation" test is

satisfied.  That condition is not satisfied here; there is no

---

[13] 42 U.S.C. § 12181(7)(F) identifies the following as public
accommodations: "a laundromat, dry-cleaner, bank, barber shop, beauty shop,
travel service, shoe repair service, funeral parlor, gas station, office of
an accountant or lawyer, pharmacy, *insurance office*, professional office of a
health care provider, hospital, or other service establishment." (Emphasis
added.)

allegation that Newsday operates public-facing, physical places in which newspapers — or any other goods or services — are sold.[14]

In that regard, *Pallozzi's* holding (and its application to this case) is consistent with the decisions of other circuits considering the applicability of the ADA to insurance policies. In *Weyer v. Twentieth Century*, for example, the Ninth Circuit held that an *employer*-issued insurance policy is not covered under the ADA. 198 F.3d at 1114. Under the statute, according to *Weyer*, "some connection between the good or service complained of and an actual physical place is required." *Id.* And that requirement could not be satisfied when the insurance policy in question was not being sold by an insurance office. Likewise, in *Parker v. Metropolitan Life Insurance Co.*, the Sixth Circuit held that "a public accommodation is a physical place." 121 F.3d 1006, 1010-11 (6th Cir. 1997). "A benefit plan offered by an employer" was not covered, therefore, because it was "not a good offered by a place of public accommodation." *Id.* (noting that a "public accommodation is a physical place"); *see also Ford*, 145 F.3d at

---

[14] Plaintiff argues that Newsday "has its own television and video/internet studio in addition to its publishing and adverting production facilities and offices." Opp. at 5. But Plaintiff does not allege that these facilities are open to Newsday's customers, or that Newsday sells its newspapers (or any other "goods" or "services") at those locations.

612-13 (plaintiff who received disability benefits through her employer was not "discriminated against in connection with a public accommodation" because "she had no nexus to [the insurance company's] 'insurance office'").

At most, therefore, *Pallozzi* supports the conclusion that websites are swept up in Title III when they offer the same "goods and services" as the business's brick-and-mortar operation.  Other courts have reached similar conclusions in applying the ADA to the websites of businesses that do maintain public-facing, physical storefronts (unlike Newsday).  *See, e.g.*, *Domino's Pizza,* 913 F.3d at 905-06 (holding that the ADA applies to Domino's website and app, which "facilitate access to the goods and services of a place of public accommodation — Domino's physical restaurants").  In *Suvino v. Time Warner Cable, Inc.*, No. 16-CV-7046, 2017 WL 3834777, at *2 (S.D.N.Y. Aug. 31, 2017), the court seems to have read *Pallozzi* just as I do, on its way to holding that the ADA applied to Time Warner Cable's website because the "website functionalities . . . are among the service features sold through the physical locations and thus are an aspect of the goods and services offered by the stores as public accommodations."

To be sure, several district courts in this Circuit have concluded that a website is a place of public accommodation in its own right, whether or not it is attached to a brick-and-

mortar business.  *See, e.g.*, *Winegard v. Crain Commc'ns, Inc.*, No. 20-CV-1509, 2021 WL 1198960, at *2 (S.D.N.Y. Mar. 30, 2021); *Thorne v. Formula 1 Motorsports, Inc.*, No. 19-CV-1077, 2019 WL 6916098, at *2 (S.D.N.Y. Dec. 19, 2019); *Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 386 (E.D.N.Y. 2017).[15]  But these cases rely heavily on *Pallozzi.  See, e.g.*, *Winegard*, 2021 WL 1198960, at *2 ("Following the Second Circuit's decision in *Pallozzi*[,] . . . many courts in this circuit, including this one, have held that websites qualify as places of public accommodation under the ADA.").[16]  And as indicated above, I do not read *Pallozzi* to dictate this conclusion.[17]

_____

[15] These observations in *Thorne* and *Blick Art* were dicta: both companies did have physical facilities, so there was no need for these courts to decide whether websites are "places of public accommodation" on a stand-alone basis. *See Thorne*, 2019 WL 6916098, at *1 (Formula 1 "advertises, markets, distributes, and sells boats and boating accessories at physical locations located in New York"); *Blick Art*, 268 F. Supp. 3d at 386 ("Blick owns and operates nationwide brick-and-mortar retail stores that sell art supplies.").

[16] The plaintiff in *Winegard v. Crain Communications* is the same Winegard as in this case.  By this Court's count, Mr. Winegard had filed at least forty-four ADA lawsuits in this district alone as of August 16, 2021.

[17] These cases are actually expanding *Pallozzi*'s holding.  And they do so while offering no limiting principle for the expansion.  Many of these cases suggest that *every* website is a "place of public accommodation."  *See, e.g.*, *Winegard*, 2021 WL 1198960, at *2 ("Following [*Pallozzi*], . . . many courts in this circuit, including this one, have held that websites qualify as places of public accommodation under the ADA."); *Thorne*, 2019 WL 6916098, at *2 ("Following *Pallozzi*, multiple district courts in this circuit have held that websites qualify as places of public accommodation under the ADA. . . . This Court concurs.").  Absent some limiting principle, this would mean that every operator of a website — every blogger, vlogger, and the like — must provide closed captioning and any other accommodation required by the ADA.

Some authorities suggest a possible limitation on this rule — namely, that the ADA applies only to websites that offer "goods and services."  *See,*

In addition to relying on *Pallozzi*, some of these cases invoke policy arguments — as the Plaintiff does here. *See, e.g.*, *Scribd Inc.*, 97 F. Supp. 3d at 575 ("Now that the Internet plays such a critical role in the personal and professional lives of Americans, excluding disabled persons from access . . . would defeat the purpose of this important civil rights legislation."). But "considerations of policy divorced from the statute's text and purpose could not override its meaning." *United States v. Tohono O'Odham Nation*, 131 S. Ct. 1723, 1731 (2011). And courts are perhaps especially ill-equipped to make policy in the ADA context. *See, e.g.*, *George v. Bay Area Rapid Transit*, 577 F.3d 1005, 1012–13 (9th Cir. 2009) (expansive interpretations of ADA can be "problematic" because "courts are ill-equipped . . . to make what amount to engineering, architectural, and policy determinations as to whether a particular design feature is feasible and desirable") (quoting *Indep. Living Res. v. Oregon Arena Corp.*, 982 F. Supp. 698, 746 (D. Or. 1997)).

---

*e.g.*, *Del-Orden v. Bonobos, Inc.*, No. 17-CV-2744, 2017 WL 6547902, at *5 (S.D.N.Y. Dec. 20, 2017) (stating that following *Pallozzi*, "four district courts in this Circuit . . . have each held . . . that Title III extends to online fora *offering goods and services*") (emphasis added)); 75 Fed. Reg. 43460-01 (July 6, 2010) ("The Department [of Justice] believes that [T]itle III reaches the Web sites *of entities that provide goods or services* that fall within the 12 categories of 'public accommodations,' as defined by the statute and regulations." (emphasis added)). But the textual basis for this limitation in the ADA is unclear. Section 12182(a), for example, prohibits discrimination not only in the enjoyment of goods and services, but also in the enjoyment of the "facilities" and "privileges" of every place of public accommodation.

Having dismissed the federal claims, I decline to exercise supplemental jurisdiction over the state-law claims. 28 U.S.C. § 1367(c); *see also Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004) ("[O]ur Court has held, as a general proposition, that 'if [all] federal claims are dismissed before trial, . . . the state claims should be dismissed as well.'" (emphasis omitted)).

### III. Conclusion

The issue decided here is of course a matter of significant importance for the deaf and hard-of-hearing community, and also for almost any business that would develop or maintain a website.  In the end, this is an issue for Congress to resolve, and Congress did so in 1990 when it restricted the ADA's application to the operation of physical premises.  For the foregoing reasons, the Defendant's motion to dismiss is granted.  The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.


/s Eric Komitee
ERIC KOMITEE
United States District Judge


Dated:    August 16, 2021
          Brooklyn, New York

22